IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIOLA N. CAUDELL, §
§
Plaintiff, §
§
v. § CIVIL ACTION NO. H-18-2897
§
ANDREW SAUL,[1] §
COMMISSIONER OF THE §
SOCIAL SECURITY ADMINISTRATION, §
§
Defendant. §

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 13) and Defendant's Cross-Motion for Summary Judgment (Doc. 11). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or

---

[1] Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 4, Ord. Dated Oct. 1, 2018.

"Defendant") regarding Plaintiff's claim for supplemental security income under Title XVI of the Social Security Act ("the Act").

## A. **Medical History**

Plaintiff was born on January 25, 1993, and was twenty-three years old on the alleged disability onset date of September 8, 2016.[3]

On November 3, 2015, Plaintiff went to the Burke Center seeking help for depression and anxiety.[4] She left before completing the intake process.[5] Plaintiff returned on November 12, 2015, to complete an initial assessment.[6] Plaintiff reported severe anxiety and depression, and a Licensed Professional Counselor ("LPC") determined that Plaintiff would benefit from services to address dysthymia and anxiety.[7] The LPC determined that the indicators of major depressive disorder and dysthymic disorder were also present.[8]

On November 19, 2015, Plaintiff began bimonthly individual counseling with Jillian Dunaway ("Dunaway"), an LPC-intern

---

[3] See Doc. 7, Tr. of the Admin. Proceedings ("Tr.") 79. At her hearing, Plaintiff amended her alleged onset date from January 1, 2013, to September 8, 2016. See Tr. 41-42.

[4] See Tr. 415.

[5] See Tr. 416.

[6] See Tr. 417.

[7] See id.

[8] See Tr. 355-56.

supervised by Dr. Jeffrey Sullivan.[9]  Plaintiff reported anxiety and depression that was worsening over time.[10]  Plaintiff had been taking citalopram for her depression and other medications for migraines.[11]  Dunaway noted that Plaintiff appeared shy and demonstrated some symptoms of anxiety but was open and engaged in the session.[12]  On December 3, 2015, Dunaway noted that Plaintiff showed depressive symptoms, appeared to have low self-esteem, and had difficulty managing conversations.[13]  On December 17, 2015, Dunaway noted that Plaintiff was more engaged than during her last session.[14]  On January 8, 2016, Dunaway noted that Plaintiff was "a very shy, insecure, and socially anxious young woman."[15]

On January 13, 2016, Dunaway noted that Plaintiff "continue[d] to grow in session regarding her conversation skills" and completed all of her homework assignments.[16]  On January 25, 2016, Plaintiff was seen by Alexa Sweeney ("Sweeney"), a nurse practitioner, for depression with anxiety and headaches.[17]  Sweeney diagnosed

---

[9]     See Tr. 337, 419.

[10]    See Tr. 419.

[11]    See Tr. 314.

[12]    See Tr. 419.

[13]    See Tr. 420.

[14]    See Tr. 421.

[15]    See Tr. 422.

[16]    See Tr. 423.

[17]    See Tr. 471.

Plaintiff with dysthymic disorder and chronic migraines without aura.[18]

On January 27, 2016, Dunaway noted that Plaintiff was "showing improvement in her communication in sessions by responding with more elaboration, correcting [Dunaway] where necessary, and using humor where appropriate."[19]  On February 12, 2016, Dunaway noted that Plaintiff was becoming more comfortable sharing feelings and thoughts in sessions.[20]

On March 2, 2016, Plaintiff told Dunaway that her depression was being managed by the antidepressant medication although she still had low energy.[21]  Dunaway noted that Plaintiff's communication skills continued to improve and she had begun to show assertive language.[22]  On April 8, 2016, Plaintiff reported that she had volunteered at the Society for the Prevention of Cruelty to Animals ("SPCA") and it went well.[23]  Dunaway noted that Plaintiff continued to show progress in her conversational skills and dealing with her anxiety.[24]

On May 19, 2016, Plaintiff admitted that she had fleeting

---

[18]    See Tr. 472.

[19]    See Tr. 425.

[20]    See Tr. 426.

[21]    See Tr. 430.

[22]    See id.

[23]    See Tr. 434.

[24]    See id.

4

suicidal thoughts without intent and that she had cut herself after fights with her mom and sister.[25]    On May 27, 2016, Plaintiff reported that she continued to volunteer at the animal shelter.[26] Dunaway noted that Plaintiff was struggling with continued growth and change in the face of her family's dysfunction.[27]

On July 1, 2016, Plaintiff reported that she was doing very well and her anxiety was much better managed.[28]    Plaintiff also reported that her medications were helping and she had never felt so happy or hopeful in her life.[29]    Dunaway noted that Plaintiff continued to progress in the management of her symptoms.[30]

On August 4, 2016, Plaintiff discussed her goals of applying for jobs once her social anxiety was more managed.[31]    Dunaway noted that Plaintiff continued to progress in managing her anxiety, but still struggled with social interaction.[32]    On August 25, 2016, Dunaway noted that Plaintiff showed progress in understanding healthy versus unhealthy behaviors and management of her

---

[25]    See Tr. 375.

[26]    See Tr. 439.

[27]    See id.

[28]    See Tr. 446.

[29]    See id.

[30]    See id.

[31]    See Tr. 450.

[32]    See id.

problematic symptoms.[33]

On September 8, 2016, Plaintiff reported that she had engaged in a conversation with a stranger at a Game Stop.[34]  Dunaway noted that Plaintiff was making excellent progress in managing her symptoms and suggested to Plaintiff that she become a Burke Center success story because she had made such significant progress.[35]  On September 21, 2016, Dunaway noted that Plaintiff continued to open up more in each session and that she was starting to trust her instincts.[36]

On November 29, 2016, Plaintiff reported that her migraines were worsening, but her depression and anxiety was noted as "stable or improved[.]"[37]

On January 25, 2017, Dunaway noted that Plaintiff continued to show progress in the management of her symptoms.  On February 3, 2017, Plaintiff told Dunaway that "it feels good not being miserable."[38]  On February 8, 2017, Plaintiff was successful in an exercise where she held a casual conversation with a Burke Center employee.[39]

---

[33]    See Tr. 454.

[34]    See Tr. 455.

[35]    See id.

[36]    See Tr. 456.

[37]    See Tr. 404-406.

[38]    See Tr. 523.

[39]    See Tr. 524.

On February 22, 2017, Plaintiff reported to Dunaway that she had begun practicing conversing with people online through live and streaming chats.[40] Dunaway noted that Plaintiff continued to show insight and utilize coping skills to manage her anxiety.[41]

On March 18, 2017, at Defendant's request, Plaintiff underwent a consultative examination performed by Ronald W. Anderson, Ph.D. ("Dr. Anderson"), a licensed psychologist.[42] At the interview, Plaintiff indicated that her treatment program at Burke was "very beneficial" and she was making positive progress.[43] Dr. Anderson noted that Plaintiff appeared to have been "in a state of decompensation for years, with her being very threat sensitive and avoiding contact with people other than family members."[44] Dr. Anderson noted that Plaintiff was "polite and cooperative" and seemed a little anxious, but became more comfortable as the exam progressed.[45] Dr. Anderson also noted that Plaintiff: (1) was capable of "concrete and abstract reasoning, with the thought process being fairly well organized and goal directed[;]" (2) had some mild obsessive compulsive traits including checking and re-checking door locks, worrying about dental issues, and, in the

---

[40] See Tr. 525.

[41] See id.

[42] See Tr. 460.

[43] See Tr. 461.

[44] See Tr. 462.

[45] See Tr. 462-463.

past, excessively washing her hands; (3) "could be described as anxious, apprehensive, guarded and a little sad[;]" (4) was oriented to time, place and person; (5) had good memory but her general fund of knowledge was a little below average; (6) possessed fairly good levels of concentration and attention; and (7) had intact judgment and fairly good insight.[46] Dr. Anderson diagnosed Plaintiff with "[p]ersistent depressive disorder (dysthymia), with history of intermittent major depressive episodes[,] . . . [s]ocial anxiety disorder[, and] . . . [g]eneralized anxiety disorder.[47] Considering Plaintiff's functional capacity, Dr. Anderson found that Plaintiff "appears to be capable of understanding, remembering and carrying out instructions that involve a few organized steps, . . . [but] her ability to concentrate and persist in a work-related activity at a reasonable pace appears very poor."[48]

On March 24, 2017, Plaintiff was seen by Bonnie Wittpenn ("Wittpenn"), a nurse practitioner at the Burke Center.[49] Plaintiff reported that she had been off of her medications for a week and her depression was worsening.[50] On March 31, 2017, Plaintiff was seen by Dunaway for a routine appointment.[51] Plaintiff's anxiety

---

[46]    See Tr. 463-464.

[47]    See Tr. 464.

[48]    See id.

[49]    See Tr. 490.

[50]    See id.

[51]    See Tr. 527.

was improved, but she continued to struggle with intense social phobia.[52] Dunaway noted that Plaintiff continued to improve, but was limited by her dependence on family.[53]

On April 17, 2017, Plaintiff was seen by Crystal Holloway ("Holloway"), a family nurse practitioner.[54] Holloway completed a functional assessment of Plaintiff and treated her for migraines.[55] Plaintiff self-reported her history of migraines and corresponding treatment.[56] Plaintiff reported that she took atenolol to help control her migraines.[57] However, the migraines occurred fifteen or more days per month and only went away with darkness and rest.[58] Holloway found that Plaintiff would need to be absent from work more than five days per month and, at work, Plaintiff would be off task more than fifteen percent of a normal work day and would be unable to concentrate for two consecutive hours more than eight days per month.[59] Holloway diagnosed Plaintiff with chronic migraines without aura and dysthymic disorder.[60]

---

[52] See id.

[53] See id.

[54] See Tr. 466-469, 474.

[55] See id.

[56] See Tr. 469.

[57] See Tr. 466.

[58] See Tr. 466-468.

[59] See Tr. 467.

[60] See Tr. 474-475.

On April 28, 2017, Plaintiff was seen by Dunaway for a routine appointment.[61]   Plaintiff and Dunaway discussed Plaintiff's potential diagnosis of avoidant personality disorder.[62]   Dunaway noted that Plaintiff continued to show insight and understanding of her thoughts, but that she was unable to function in an organic social experience.[63]

On May 3, 2017, Wittpenn completed a medical statement and functional assessment of Plaintiff.[64] Wittpenn found that Plaintiff "will likely be unable to work in a public job that requires face to face and immediate interactions and responses."[65]   Wittpenn also found that it was impossible for Plaintiff to speak organically to other people in a stressful or unplanned situation.[66]   Wittpenn determined that if Plaintiff attempted to work she would be: (1) absent more than five days per month; (2) off task more than fifteen percent of a normal work day; and (3) unable to maintain concentration and attention for two hours at a time.[67]

On May 9, 2017, Plaintiff was seen by Sherry Howard

---

[61]    See Tr. 528.

[62]    See id.

[63]    See id.

[64]    See Tr. 477.

[65]    See id.

[66]    See id.

[67]    See Tr. 478.

("Howard"), an LPC.[68]  Howard diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and dysthymic disorder.[69]  Plaintiff was also diagnosed with avoidant personality disorder, which had been previously ruled out.[70]  On the same day, Plaintiff met with Dunaway who expressed that Plaintiff was unable to work in the public sector at that time.[71]

On July 14, 2017, Plaintiff was seen by Howard for a follow-up appointment.[72]  Plaintiff reported that her medication dosage was helping and she felt less anxious and depressed.[73]

On December 22, 2017, Plaintiff was seen by Dunaway for a routine appointment and reported that she was maintaining a daily routine of washing dishes.[74]

On January 30, 2018, Plaintiff was seen by Wittpenn for a follow-up appointment to manage her medications.[75]  Plaintiff reported that she had been stressed and feeling a bit down, but was doing better after taking a smaller dosage of her medication.[76]

---

[68]    See Tr. 508-510.

[69]    See Tr. 508.

[70]    See Tr. 508, 519.

[71]    See Tr. 532.

[72]    See Tr. 534.

[73]    See id.

[74]    See Tr. 615.

[75]    See Tr. 581.

[76]    See id.

Wittpenn diagnosed Plaintiff with a single episode of major depressive disorder, unspecified gender identity disorder, avoidant personality disorder, and migraines.[77]

After filing her application for disability benefits from July 31, 2017, to January 31, 2018, Plaintiff kept a daily journal of her symptoms.[78]  In the journal, she described her symptoms and rated her depression, tiredness, headaches, and anxiety on a scale of one to ten.[79]

## B.  Application to SSA

Plaintiff applied for supplemental security income benefits claiming an inability to work since January 1, 2013, due to dysthymic disorder and generalized anxiety disorder.[80]  On August 10, 2016, Plaintiff completed a function report where she described how her conditions affected her ability to work.[81] Plaintiff stated that her conditions caused her to freeze up, and that she experience anxiety attacks if she had to work with others.[82]  She also stated that if she attempted a task by herself she needed step by step directions and was unable to handle someone being upset

---

[77]    See Tr. 588.

[78]    See Tr. 618-660.

[79]    See id.

[80]    See Tr. 180.

[81]    See Tr. 206.

[82]    See id.

with her.[83]  Plaintiff indicated that her conditions affected her ability to concentrate, talk, understand, follow instructions, and get along with others.[84]  Plaintiff described her daily routine as getting dressed, cleaning the house, watching television, and drawing.[85]  Plaintiff was able to take care of her pets without help from family, but had never been able to socialize and had issues with sleep.[86]  Plaintiff indicated that she prepared her own meals and did not need encouragement to do household chores.[87]  Plaintiff stated that her hobbies were to draw, write, volunteer, play games, and watch television, and that she did these hobbies on a daily basis.[88]

On December 9, 2016, Plaintiff completed another disability report.[89]  Plaintiff primarily reiterated what was stated in the first function report.[90]  However, Plaintiff added more detail to the second function report.[91]  Specifically, Plaintiff explained that when she had "bad days," she was generally unable to do

---

[83]  See id.

[84]  See Tr. 211.

[85]  See Tr. 207.

[86]  See id.

[87]  See Tr. 208

[88]  See Tr. 210.

[89]  See Tr. 231.

[90]  See Tr. 231-238.

[91]  See id.

anything other than sleep and required help taking care of her pets.[92]  Plaintiff also added detail about her migraines, stating that during a migraine she was "even les[s] functional because [she was] sensitive to smells, lights, and sounds, and ha[d] to be in a quiet dark room to relieve the symptoms."[93]

On March 21, 2017, the SSA found Plaintiff not disabled at the initial level of review.[94]  On July 7, 2017, the SSA again found Plaintiff not disabled upon reconsideration.[95]  Plaintiff requested a hearing before an ALJ.[96]  The ALJ granted Plaintiff's request and scheduled the hearing on February 6, 2018.[97]

## C.  **Hearing**

At the hearing, Plaintiff, Plaintiff's mother, Shirley Caudell ("Mrs. Caudell"), and a vocational expert testified.[98]

Plaintiff testified that she lived with her parents.[99] Plaintiff completed the eleventh grade, but failed the math portion of the GED.[100]

---

[92]    See id.

[93]    See Tr. 238.

[94]    See Tr. 88.

[95]    See Tr. 106.

[96]    See Tr. 126.

[97]    See Tr. 147.

[98]    See Tr. 35.

[99]    See Tr. 45.

[100]   See Tr. 45-46.

Plaintiff testified that she had been receiving help for the past couple of years from her doctor and counselor, who she was still seeing on a regular basis.[101] Plaintiff reported having difficulty talking to others her entire life.[102] Plaintiff testified that what she wrote in her journal was a better representation of what was going on in her life than what she told the counselor in person.[103]

Plaintiff testified that in 2012 she tried to work a couple of jobs while living with her sister in Spring, Texas.[104] Plaintiff worked at a Kentucky Fried Chicken for three or four weeks.[105] There, Plaintiff struggled to keep up with her job responsibilities and her hours were cut as a result.[106] Plaintiff then tried to work at a Family Dollar store.[107] At the dollar store Plaintiff worked as a cashier and would also restock and reorganize the shelves.[108] Plaintiff had a difficult time working the cash register as her receipts were off by over twenty dollars on a daily basis.[109]

---

[101]    See Tr. 47.

[102]    See Tr. 48.

[103]    See Tr. 49.

[104]    See id.

[105]    See Tr. 50.

[106]    See Tr. 50-51.

[107]    See Tr. 51.

[108]    See id.

[109]    See Tr. 52.

Plaintiff's job at the dollar store was seasonal and, because of her low job performance, she was not offered a full-time job.[110]

Plaintiff testified that her interests were browsing the internet, watching videos, and playing games.[111]  Plaintiff slept a great deal during the day, especially when she was having migraines.[112]  Plaintiff typically went to bed at around 1-2 a.m. and slept for twelve to fourteen hours, but awoke still feeling tired.[113]  Plaintiff voiced feeling guilty about her low level of productivity.[114]

Plaintiff testified that she had trouble concentrating when she was anxious, which happened around four days a week.[115] Plaintiff had panic attacks once or twice a month and generally experienced some level of anxiety.[116]  Plaintiff had difficulty being around other people and had no friends.[117]  When Plaintiff was in public she became anxious if people talked to her.[118]  Before bed, Plaintiff usually checked the door multiple times to make sure

---

[110]    See id.

[111]    See id.

[112]    See id.

[113]    See Tr. 53.

[114]    See Tr. 53-54.

[115]    See Tr. 54.

[116]    See Tr. 54-55.

[117]    See Tr. 55.

[118]    See Tr. 56.

it was locked.[119]   When opening a door, Plaintiff would put her sleeve over her hand because she was scared of diseases.[120] Plaintiff always avoided conversations with strangers and had been that way her entire life.[121]

Plaintiff testified that it took her a long time to complete chores and could take all day to just clean the dishes.[122] Plaintiff reported having migraines since 2015.[123]  In January 2016, Plaintiff began seeing Holloway for her migraines and was prescribed medication.[124]  Plaintiff had migraines three to four days a week which required her to lie in a dark room for the rest of the day.[125] The migraines continued to occur despite Plaintiff's taking the medication.[126]  Plaintiff's voiced goal was to one day be able to interact with the public and get a job.[127]

Mrs. Caudell testified that she first realized that Plaintiff had mental health issues when Plaintiff was around eleven years

---

[119]    See Tr. 56-57.

[120]    See Tr. 57.

[121]    See Tr. 58.

[122]    See Tr. 59.

[123]    See Tr. 60.

[124]    See id.

[125]    See id.

[126]    See Tr. 61.

[127]    See id.

old.[128]  Plaintiff would regularly panic, appeared depressed, and
would wash her hands continuously.[129]  After failing at her two
jobs, Plaintiff returned to live with Mrs. Caudell and fell into a
deep depression.[130]

Mrs. Caudell testified that Plaintiff had difficulty talking
to strangers, slept twelve to fourteen hours a day, and got a lot
of headaches.[131]  She agreed that Plaintiff took all day to wash the
dishes and was anxious even around family members.[132]  Mrs. Caudell
believed that Plaintiff wanted to get better.[133]

The ALJ questioned the vocational expert, Teresa Rogers
("Rogers"), next.[134]  The ALJ began by presenting a hypothetical
individual who possessed Plaintiff's age, education, and work
experience, but was "limited to simple, routine work with no
interaction with the public, and only occasional interaction with
coworkers and supervisors."[135]  Rogers testified that such an
individual would be able to work as a linen room attendant, laundry

---

[128]    See Tr. 64.

[129]    See id.

[130]    See Tr. 65.

[131]    See Tr. 67.

[132]    See Tr. 68.

[133]    See Tr. 69-70.

[134]    See Tr. 70.

[135]    See Tr. 71.

worker, and industrial cleaner.[136]

The ALJ added the limitation that the hypothetical person would be off-task thirty-five percent of the day in addition to scheduled breaks.[137] Rogers testified that such an individual would not be able to work on full-time basis.[138] The ALJ changed the added limitation to be that the hypothetical individual would have unexcused or unscheduled absences one to two times per week.[139] Rogers testified that this hypothetical individual would be unable to work on a full-time basis.[140]

Plaintiff's attorney questioned Rogers next. Plaintiff's attorney asked whether a hypothetical individual who needed three to four thirty-minute breaks per day to deal with migraines and anxiety would be able to work on a full-time basis.[141] Rogers testified that such an individual would be unable to work on a full-time basis.[142]

**D. Commissioner's Decision**

On February 22, 2018, the ALJ issued an unfavorable

---

[136]    See id.

[137]    See id.

[138]    See Tr. 72.

[139]    See id.

[140]    See id.

[141]    See Tr. 73.

[142]    See id.

decision.[143]   The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 8, 2016, the alleged onset date.   The ALJ recognized the following impairments as severe:   "migraine   headaches;   anxiety   disorder;   and depressive/dysthymic disorder (20 CFR 416.920(c))."[144]   At the Listing step, the ALJ found that Plaintiff did not meet the requirements of any Listing, addressing Listings 12.04, depressive and bipolar related disorders, and 12.06, anxiety and obsessive-compulsive disorders.[145]   The ALJ found that Plaintiff did not meet the Paragraph B criteria of Listings 12.04 and 12.06 because she did not have two "marked" limitations or one "extreme" limitation.[146] The ALJ also found that Plaintiff did not meet the Paragraph C criteria of Listings 12.04 and 12.06 because there was no evidence of a highly structured or medical treatment setting, that was ongoing, and that diminished Plaintiff's symptoms coupled with objective medical evidence that Plaintiff had minimal capacity to adapt to changes to her environment and daily life.[147]

In determining that Plaintiff did not meet Paragraph B criteria, the ALJ discussed the broad areas of functioning that

---

[143]   See Tr. 14.

[144]   See Tr. 19.

[145]   See Tr. 20.

[146]   See Tr. 22.

[147]   See id.

required two "marked" limitations or one "extreme" limitation.[148] These areas were: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.[149]

The ALJ found that Plaintiff had "no more than a moderate limitation in her understanding, remembering, or ability to apply information."[150] The ALJ based this finding on Plaintiff's testimony regarding her interests and the information reported by Dr. Anderson's consultative examination.[151]

The ALJ found that Plaintiff had "no more than a moderate limitation in her social functioning."[152] The ALJ based this finding on Plaintiff's demeanor during Dr. Anderson's consultative examination and the fact that Plaintiff volunteered at an animal shelter.[153]

The ALJ found that Plaintiff had "no more than a moderate limitation in her concentration, persistence, or pace."[154] The ALJ based this finding on information reported by Dr. Anderson in his

---

[148]   See Tr. 20.

[149]   See id.

[150]   See id.

[151]   See id.

[152]   See Tr. 21.

[153]   See Tr. 20-21.

[154]   See Tr. 21.

consultative examination. Specifically, he found that Plaintiff could perform routine tasks, had fairly good levels of concentration and attention, and could work simple math problems without difficulty.[155]

The ALJ found that Plaintiff had "no more than a moderate limitation when adapting or managing herself."[156] The ALJ based this finding on information found in Dr. Anderson's report that Plaintiff could care for her personal hygiene, complete household chores, take care of her dog, use the telephone and post office, and participate in various hobbies.[157]

The ALJ thoroughly discussed Plaintiff's medical treatment for her impairments.[158] The ALJ gave Dr. Anderson's opinion regarding Plaintiff's functional limitations "very little weight" because Plaintiff appeared to be making excellent progress in managing her symptoms.[159] The ALJ gave Holloway's opinion regarding Plaintiff's functional limitations caused by her migraines "very little weight" because Holloway was a nurse practitioner and her opinion was not supported by the record as a whole.[160] The ALJ gave Wittpenn's opinion regarding Plaintiff's functional limitations very little

---

[155] See id.

[156] See id.

[157] See id.

[158] See Tr. 22-29.

[159] See Tr. 26.

[160] See id.

weight because Wittpenn was a nurse practitioner and her opinion was not supported by the objective medical record.[161] The ALJ gave Plaintiff's journal and reports of Mrs. Caudell very little weight because they were not supported by the objective medical record.[162] Finally, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ."[163]

The ALJ found that Plaintiff had the RFC "to perform a full range of work at all exertional limitations, but with the following non-exertional limitations: she is limited to simple, routine work. The claimant can have no interaction with the public, and only occasional interaction with coworkers and supervisors."[164] The ALJ then considered Rogers' testimony that a person with the outlined RFC would be able work as a linen room attendant, laundry worker, or industrial cleaner.[165] Accordingly, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[166]

On March 19, 2018, Plaintiff submitted an independent medical

---

[161]    See Tr. 27.

[162]    See id.

[163]    See Tr. 28.

[164]    See Tr. 22.

[165]    See Tr. 29-30.

[166]    See Tr. 30.

evaluation as additional evidence for the Appeals Council's consideration.[167] On April 16, 2018, Plaintiff appealed the ALJ's decision.[168] On June 18, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[169] Regarding the new evidence Plaintiff submitted, the Appeals Council stated: "We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence."[170] After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of

---

[167]    See Tr. 2.

[168]    See Tr. 178.

[169]    See Tr. 1-5.

[170]    See Tr. 2.

the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); <u>see also</u> 20 C.F.R. § 404.1520. The analysis stops at any point in the process

upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019) (internal quotations marks omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id.  It only requires "more than a mere scintilla." Id. (quoting Consol. Edison Co., 305 U.S. at 229).

The Commissioner has the responsibility of deciding any conflict in the evidence. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) the "Appeals Council failed to discharge its duty to consider new and material evidence[;]" and (2) "Defendant failed to find that [Plaintiff's] mental impairments, considered singly and in combination, met or medically equaled the criteria of [L]istings 12.04 or 12.06."[171] Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.   <u>Listings 12.04 and 12.06</u>

Plaintiff specifically challenges the ALJ's finding that Plaintiff did not meet the criteria of Paragraph B of Listings 12.04 and 12.06 and the weight assigned by the ALJ to Dr. Anderson's report and Wittpenn's functional assessment in finding that Plaintiff did not meet the criteria of the Listings.[172]

### 1.   Paragraph B Criteria

It is established and uncontested that Plaintiff meets

---

[171]    See Doc. 13, Pl.'s Mot. for Summ. J. p. 2.

[172]    See id. pp. 13-17.

Paragraph A of both Listings.  Thus, a finding that Plaintiff meets the Paragraph B criteria would mean that Plaintiff's impairment meets Listings 12.04 and 12.06.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.  Paragraph B is the same for both Listings and is satisfied if Plaintiff has an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning[:]" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; (4) adapting or managing herself. See id.  A "moderate limitation" means that "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c).  A "marked limitation" means that "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).  An "extreme limitation" means the inability "to function in this area independently, appropriately, effectively, and on a sustained basis."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(e).

The ALJ found that Plaintiff had moderate limitations in all four Paragraph B criteria.[173]  In determining that Plaintiff had a moderate limitation in understanding, remembering, and applying information, the ALJ considered the following from Plaintiff's

---

[173]    See Tr. 20-21.

consultative examination with Dr. Anderson: (1) Plaintiff was found capable of concrete and abstract reasoning; (2) Plaintiff's thought process was well organized and goal directed; (3) Plaintiff's intellectual functioning was in the average to low average range; and (4) Plaintiff's remote memory was fairly good and her recent memory was good.[174] The ALJ also considered Plaintiff's testimony that she watched videos on the internet and played games, and that Plaintiff was creative and posted art online.[175] The court finds that the evidence cited by the ALJ supports the conclusion that Plaintiff was only moderately impaired in her ability to understand, remember, and apply information.

In determining that Plaintiff had a moderate limitation in interacting with others, the ALJ considered Plaintiff's testimony about her difficulties being in public and around others.[176] The ALJ also considered that Plaintiff had no friends and mainly associated with her family, psychiatrist, and therapist.[177] The ALJ then considered that during the consultative examination with Dr. Anderson: (1) Plaintiff was quiet and a little anxious at first, but then became more comfortable; (2) Plaintiff maintained good eye contact throughout the examination; (3) Plaintiff's judgment was

---

[174]    See Tr. 20.

[175]    See id.

[176]    See id.

[177]    See id.

intact and her insight was "fairly good;" and (4) Plaintiff was polite and cooperative.[178]   Finally the ALJ considered that Plaintiff had volunteered at an animal shelter during her medical treatment.[179]   While the evidence considered by the ALJ on this point is not overwhelming, it is adequate to support the conclusion that Plaintiff was moderately limited in her ability to interact with others.   Accordingly, the ALJ's finding is supported by substantial evidence.

In determining that Plaintiff had a moderate limitation in her ability to concentrate, persist, or maintain pace, the ALJ considered Plaintiff's testimony that her anxiety made it difficult for her to pay attention or concentrate.[180]   The ALJ then considered the following from Plaintiff's consultative examination with Dr. Anderson: (1) Dr. Anderson reported that Plaintiff could perform routine, daily tasks; (2) Plaintiff had a "fairly good level" of concentration and attention; and (3) Plaintiff could work simple math problems without difficulty.   The court finds that the evidence cited by the ALJ supports the conclusion that Plaintiff was only moderately impaired in her ability to concentrate, persist, and maintain pace.

Finally, in determining that Plaintiff had a moderate

---

[178]   See Tr. 20-21.

[179]   See Tr. 21.

[180]   See id.

limitation in her ability to adapt or manage herself, the ALJ considered Plaintiff's testimony that she watched videos online and played games, went to bed late and slept late, and helped around the house but took all day to do the dishes.[181] The ALJ then considered the following from Plaintiff's consultative examination with Dr. Anderson: (1) Plaintiff could take care of her personal hygiene; (2) Plaintiff helped with household chores and cared for her dog; (3) Plaintiff could use the telephone and postal service, but seldomly shopped independently; (4) Plaintiff enjoyed reading, writing, and watching television; (5) Plaintiff loved art and posted her art online; and (6) Plaintiff was able to perform routine, daily tasks.[182] The court finds that the evidence cited by the ALJ supports the conclusion that Plaintiff was only moderately impaired in her ability to adapt and manage herself.

The ALJ thoroughly considered the evidence in the record and cited to adequate evidence to support the conclusion that Plaintiff did not meet the criteria of Paragraph B of Listings 12.04 and 12.06. Accordingly, the court finds that the ALJ's finding that Plaintiff did not meet the criteria of the Listings was supported by substantial evidence.

## 2. Dr. Anderson's Report

Plaintiff argues that the ALJ did not give proper weight to

---

[181]    See id.

[182]    See id.

Dr. Anderson's report where he opined that: (1) Plaintiff had persistent depressive disorder with a history of intermittent major depressive episodes; (2) Plaintiff's ability to concentrate and persist at work at a reasonable pace was very poor; and (3) Plaintiff would benefit from guidance planning and managing money if allowed benefits.[183]

The ALJ considered Dr. Anderson's diagnosis and found that Plaintiff had depressive disorder.[184] The ALJ did not disregard Dr. Anderson's diagnosis as Plaintiff suggests. However, the ALJ gave "very little weight" to Dr. Anderson's opinions regarding Plaintiff's functional limitations because Plaintiff appeared to be making excellent progress in managing her symptoms as noted by Dr. Anderson and as found in Plaintiff's other medical records.[185]

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. § 404.1527(c). In determining what weight to give a medical opinion by a non-treating physician, the ALJ considers the: (1) examining relationship; (2) treatment relationship; (3) the supportability of the opinion; (4) the opinion's consistency with the record; (5) whether the opining physician is an expert; and (6) any other relevant factors. See

---

[183]  See Doc. 13, Pl.'s Mot. for Summ. J. p. 15.

[184]  See Tr. 19, 25-26.

[185]  See Tr. 26.

id. Here, the ALJ focused on the third and fourth factors.[186]

As discussed above, the ALJ cited to substantial evidence supporting the conclusion that, contrary to Dr. Anderson's opinion, Plaintiff's ability to concentrate and persist at work was only moderately impaired. The evidence cited by the ALJ included Dr. Anderson's own observations. Accordingly, the ALJ did not err in this finding.

Dr. Anderson's opinion regarding Plaintiff's ability to manage money was relevant to whether Plaintiff was impaired in her ability to adapt or manage herself. However, this fact alone is insufficient to overcome the substantial evidence cited by the ALJ on this point. The court finds that even considering Plaintiff's inability to manage money, substantial evidence supports the conclusion that Plaintiff was only moderately impaired in her ability to adapt or manage herself.

### 3. Wittpenn's Assessment

Plaintiff argues that the ALJ did not give sufficient weight to Wittpenn's opinions that: (1) Plaintiff could not speak organically to other people; (2) Plaintiff would miss more than five days each month if she tried to work; (3) Plaintiff would be off task more than fifteen percent of a normal workday; (4) Plaintiff suffered from an incurable personality disorder; (5) Plaintiff's ability to understand and remember short instructions

---

[186]    See id.

was extremely impaired; (6) Plaintiff's ability to sustain an ordinary routine without special supervision was extremely impaired; (7) Plaintiff's ability to work at a reasonable pace without interruption from mental health symptoms was extremely impaired; and (8) Plaintiff's ability to maintain a schedule and be punctual was extremely impaired.[187] The ALJ gave Wittpenn's opinion regarding Plaintiff's functional limitations very little weight because she was a nurse practitioner and her opinion was not supported by the objective medical record.[188]

Registered nurses are not included in the list of "acceptable medical sources" under the regulations for claims that were filed before March 27, 2017. See 20 C.F.R. § 416.902 ("[a]cceptable medical source means a medical source who is a . . . Licensed Advanced Practice Registered Nurse, or other license advanced practice nurse with another title, for impairments within his or her licenses scope of practice (only with respect to claims filed . . . on or after March 27, 2017)"). Plaintiff's application for supplemental security income was filed on August 10, 2016.[189] Thus, Wittpenn's opinion is considered an opinion from a medical source who was not an acceptable medical source under the regulations.[190]

---

[187]   See Doc. 13, Pl.'s Mot. for Summ. J. pp. 13-14.

[188]   See Tr. 27.

[189]   See Tr. 179.

[190]   See Tr. 27.

See 20 C.F.R. § 416.927(f). Opinions from such a source are considered under the same factors as a medical opinion by a non-treating physician, discussed above. See id.

Again, the ALJ focused on the third and fourth factors in giving "very little weight" to Wittpenn's opinion. The ALJ explained his reasoning for disregarding Wittpenn's conclusions regarding Plaintiff's functional limitations and, as discussed above, cited to substantial evidence supporting his findings regarding Plaintiff's functional limitations. Accordingly, the court finds that the ALJ did not err when giving "very little weight" to Wittpenn's conclusions.

## B.  **New Evidence**

Plaintiff submitted the independent medical evaluation of Adriana M. Strutt, Ph.D. ("Dr. Strutt"), to the Appeals Council after the ALJ had rendered his decision.[191] Dr. Strutt discussed Plaintiff's medical history, which was consistent with the record before the court. Dr. Strutt then made neuropsychological findings including that: (1) Plaintiff's general mental status was below expectation and she was incompletely oriented; (2) Plaintiff's intellectual functioning was average and her IQ was in the low average range; (3) Plaintiff's reading and spelling were average but her math skills were deficient; (4) Plaintiff's speed of reading and color naming was deficient; (5) Plaintiff's mental

---

[191]    See Tr. 8-13.

processing speed was low average and her "speeded scanning and cancellation" was average; (6) Plaintiff's performance on a sequencing task requiring scanning and mental tracking was deficient; (7) Plaintiff's abstract verbal reasoning was average; (8) Plaintiff's performance on a task requiring scanning, tracking, and set-shifting was deficient; (9) Plaintiff's memory ranged from average to low average; and (10) Plaintiff's spatial reasoning was average.[192]   Dr. Strutt confirmed Plaintiff's diagnoses of major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and avoidant personality disorder.[193]   Dr. Strutt concluded that Plaintiff's "prognosis for rehabilitation [was] poor as her current psychiatric symptomatology negatively impacts her ability to function in a competitive, sustained manner."[194]   Plaintiff argues that the Appeals Council failed to exercise its duty to consider Dr. Strutt's report.

Under 20 C.F.R. § 416.1470(a):

The Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

The Appeals Council, however, does not have to address this new evidence or explain why it denied review in its decision.  See

---

[192]   See Tr. 11-12.

[193]   See Tr. 13.

[194]   See id.

Whitehead v. Colvin, 820 F.3d 776, 780 (5ᵗʰ Cir. 2016)(citing Sun v. Colvin, 793 F.3d 502, 511 (5ᵗʰ Cir. 2015)).  A court has the power to "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  New evidence is considered "material" if there is the "reasonable possibility that it would have changed the outcome of the Secretary's determination."  Latham v. Shalala, 36 F.3d 482, 483 (5ᵗʰ Cir. 1994).

Regarding Dr. Strutt's report, the Appeals Council stated: "We find this evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not exhibit this evidence."[195]  Dr. Strutt's report is included in the record and the Appeals Council stated that it reviewed the evidence and found it would not have changed the ALJ's decision.[196]  Accordingly, the Appeals Council met its burden to consider the new evidence and was only in error if there was a reasonable probability that Dr. Strutt's report would have changed the ALJ's decision and, thus, the Appeals Council should have granted review.

Many of Dr. Strutt's neuropsychological findings placed Plaintiff in the average to low average intellectual range.  While

---

[195]    See Tr. 2.

[196]    See Tr. 8-13.

Dr. Strutt did find Plaintiff deficient in some areas, her findings did not fully support the conclusion that Plaintiff had a low probability of rehabilitation. Plaintiff had a well-documented medical history of improvement when she attended her bi-monthly therapy appointments. In light of the abundance of evidence in the record of Plaintiff's progress, the court finds that substantial evidence supports the Appeals Council's determination that there was not a reasonable probability that Dr. Strutt's report would have changed the ALJ's decision. Accordingly, the Appeals Council did not err in denying review.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 27th day of August, 2019.

Nancy K. Johnson
United States Magistrate Judge